We are pleased to be here at Harvard Law School. We look forward to these opportunities after hearings to entertain questions and talk a little bit. We have six cases this morning. Two of them are pro ses and therefore they're not being argued. One of them is a case from the Court of Federal Claims. Another is from the American Systems Protection Board involving an employee removal. We have four argued cases. They're sort of patent heavy. One is a patent case from a jury. The second is a patent case that turned into a trade secret case from a jury. The third is from the Patent Office on a re-examination. The fourth, which will be our first case, is from the Court of Federal Claims involving a vaccine claim. We'll proceed directly to that case. That's Hirmiz v. Department of Health and Human Services, 2015, 5043. Mr. McHugh. Thank you, Your Honor. Good afternoon. This afternoon we're dealing with a rejected claim in the Vaccine Injury Compensation Program. The claim involved the Hirmiz family whose little girl, at less than one year of age, began to suffer chronic spasticity, which at this point, and she's 11 years old now, is totally crippling. She has no control of any of her voluntary muscles. This claim involves spasticity. It does not claim developmental – does not involve developmental delay. Strictly spasticity. Mr. McHugh, as you know, we have a very deferential standard of review. This case was tried by Special Master. We heard expert testimony from the plaintiff and from the government and decided that the testimony of the government expert was more persuasive, particularly on fact questions, including when the symptoms of this person's illness occurred. And the testimony was that the symptoms occurred before the flu shot. And so we have fact findings here, credibility findings, and the Special Master said this case wasn't even close. So how do you deal with all that? Your Honor, as this Court ruled in Pollock in May, where the Special Master's decision, despite the fact he reviewed the record and made these decisions, when his decisions are not supported by the record at all and he misconstrues the plaintiff's case, which he did here because the question here was not developmental delay, it was spasticity, and when he just simply makes mistakes, this Court not only has the right to review, it has the obligation to review. And in this case, our position is that there are gross mistakes across the board, and we can go right to the Respondent's expert to explain this. He basically admitted that the injury to this child occurred after the flu shot, even though he opined that it started earlier. The injury is spasticity, not developmental delay. There were some signs of developmental delay beforehand. He never explained how those symptoms had anything to do with spasticity, and he admitted that after the flu shot, up until the time she saw the physical therapist at the Children's Hospital in Chicago, a period of time of 56 days, she had a precipitous decline into spasticity. He testified that spasticity is the opposite of what she showed in earlier – earlier than that shot. One was hypotonia, and the other was spasticity. They're complete opposites and extreme opposites. Kennedy. One of the things that you do in your reply brief is you suggest that you did, in fact, have an aggravation claim, which is a separate kind of claim under the statute. You had sought to leave to amend to add an aggravation claim, which was denied, but now you're contending, as I understand it, that the aggravation claim was there all the time, and that the Court of Federal Claims and Special Master made an error in not treating this as an aggravation claim. Could you comment on that? Yes. I believe that the Respondent's experts basically said that this happened before and that this was, if anything, an aggravation. So all the aggravation claim basically came from the testimony of Respondent's experts, not from the Petitioner's expert. The Petitioner's expert said there was a discernible difference between anything that happened before the shot and what happened after the shot. Before the shot, you had some debatable signs of a development of delay. After the shot, you had no debate whatsoever. You had aggravated spasticity that came on. But are you asserting that there was an aggravation claim there from the beginning? Our position has always been that there are two separate situations. There was development of delay and there was spasticity. If indeed the Special Master and the experts on the other side deem that development of delay to be the beginning of this, there was clearly aggravation. But the Petitioner has always held that the aggravation didn't – that this was a spasticity case, not a development of delay case. And in Pollock, you held, this Court held, that a child does not have to be completely well before a vaccine before he has an injury. He can be injured even if sick. And this is a perfect example of this. It's almost exactly the same as Pollock. She had symptoms before that had no indication that they had anything to do with neurology. Spasticity is entirely neurological. And it's an insult to the brain that occurs at a specific time and it causes this injury. And the experts on the other side admitted that this happened after the flu shot. He admitted it in two ways. First of all, he said that the deterioration was after the flu shot and before they got to the hospital, which is 56 days, and it was precipitous. And it was the opposite. One was the opposite of the other. The second thing he admitted was the weight charts, which are undebatable. The weight charts show that her weight was normal, was progressing normally at 75 percent up until the flu shot. After the second flu shot, it deteriorated and then sank like a tank. And so his – and he admitted that those weight charts indicated that there was an insult to that child about the time that those weight charts started to decline. That would be sort of toward the end of the vaccination. She got a vaccination in October and one in November. And then we have the other indication, and that is – and the special master made a mistake here that may have made him make a mistake. He said that at the November – on November 17th, the doctor, Dr. Pira, referred her to a neurologist, indicating that maybe she thought there was something neurologically wrong with her child. That's incorrect. She referred that child only to PT, to a physical therapist, for a loss of muscle, a decrease in muscle tone in her lower extremities, precisely the same thing she saw in October. And in October, she said she would – she was going to refer the child on the next visit, which she did. No change. Twenty-three days later, the PT at Children's Memorial Hospital sees this child and writes a report which shows she's in catastrophic decline and suffering from spasticity throughout a major portion of her body, and things just get worse after that. That is just 23 days after the flu shot. And she saw an advanced condition. She didn't see a sign of this. She saw it full bore, and it was obvious. So it's pretty obvious that on the – on November 16th, when Dr. Pira saw this child for the second flu shot, she did not see this condition. So it came up like an express train after. Now, why is that relevant? First of all, the child is reputed to have stopped feeding properly and started to cry all the time after the first flu shot. After the second flu shot, we had this catastrophic decline. That is an anamnestic response, which Dr. Pira – I mean, Dr. Oleski said was a sign of challenge, re-challenge, which is an absolute sign that that vaccination did it because she had a small reaction on the first, and she had a catastrophic reaction on the second. And under the case law, that basically eliminates the need for any further proof. He also said, when she was reviewed at the Mayo Clinic, the Mayo Clinic only reviewed her for neurological injuries. They didn't look at anything else. But in the laboratory reports, it showed that she had an autoimmune reaction in her central nervous system. They never looked at it. He said that the flu shot probably caused an autoimmune reaction, which injured her brain. And that is consistent with an anamnestic response, which was clearly seen between the mild reaction and the severe reaction, and also the lab reports from the Mayo Clinic, which indicated that the only thing they could find wrong with this child after months of review at two hospitals was this malfunction or this sign of a malfunction in her central nervous system, which was an autoimmune reaction. So all the evidence before the Court indicates there was an autoimmune reaction, which set this child off. That's the only evidence there is there. Dr. McGreevey, the government's expert, simply disagreed. Disagreed. He didn't put in any evidence. He said nothing about why. He just said he disagreed. He deemed these things to be irrelevant. Well, maybe so, except the clinical condition of this child showed an autoimmune response, and he ignored it. So did the Mayo Clinic, because they were looking only for neurological exclusions. Now, so the problem here is that the evidence, largely from the Respondent, is all one-sided. She had a quick reaction after the first flu shot to the time that the Mayo Clinic or the Children's Hospital saw her for the first time. She had a spectacular reaction after the second shot. Her weight charts are consistent with an injury after the flu, during the same period as the flu shot, not before. So whether it is an aggravation of preexisting condition, as the government would say, or a completely separate injury, spasticity, rather than developmental delay, is the position of the Petitioner. It's the same thing. She was clearly injured by the flu shot. Whether she had a slight injury before, which we say may have had something to do with the shot she got in July, because she was normal until then, but it certainly After she got the flu shot, she crashed, like, you know, very quickly. And there is absolutely, the evidence in the record is overwhelmingly, overwhelmingly shows that the injury occurred during the period of the flu shot, not before. Is there any questions? Thank you. We will save your rebuttal time for you. Mr. Johnson. Thank you, Your Honors. Good afternoon. May it please the Court. Your Honors, the argument that the injury in this case was just spasticity is What about the argument that this should have been treated as an aggravation claim from the outset, and it was tried as an aggravation claim by consent of the parties? We disagree with that, respectfully, Your Honor. That doesn't surprise me. The case that was presented below by the Petitioners through their expert Dr. Oleski was that J.H. was developmentally normal at her nine-month well-child visit, and only afterwards did she experience any kind of neurological developmental delays. So, necessarily, the case that was presented below could not have been a significant aggravation case, because their argument through Dr. Oleski was that J.H. was fine until she received her two-half-dose flu vaccination in October and November of 2004. The critical issue in this case really was, when did the first symptoms of J.H.'s illness arise? The Petitioners, again, through Dr. Oleski said it was only after the flu vaccinations, but the government's expert, Dr. McGeady, looking at the pediatric records from the six-month and nine-month well-child visits, said at the six-month well-child visit, the parents reported that I guess what you could have done, what the Special Master could have done, is to combine the testimony of the two experts and say, well, the government's expert is right that this preexisted, the flu shot, but the claimant's expert is right that the flu shot caused a significant aggravation. So, I mean, you could combine the testimony to reach that result and tell us why the claimant was not entitled to have it considered on that basis. In a sense, Your Honor, the Special Master, while he did not conduct the significant aggravation analysis under the Loving test that's been adopted by this Court, he did make a finding that the flu vaccines that J.H. received did not cause or exacerbate her condition. So implicit in his findings, in his decision, is a finding that her condition was not aggravated by the flu vaccines. And I think this really falls under his analysis of the challenge-re-challenge theory that was put forth by Dr. Olesky. I think, and as the Special Master said, Dr. Olesky's theory wasn't presented very coherently, but it could be argued that what he was saying is that the first vaccine caused some symptoms and that the second vaccine then caused the deceleration or decline in her symptoms. But looking at that theory, the Special Master said, the facts of this case don't really fit that theory. First of all, he already made the finding, or the former Special Master that issued the findings, the fact that he made the finding that the symptoms predated the first vaccine. There's nothing in the pediatric records to suggest that there was really any reaction following the first half-dose of the flu vaccine. And then if you look at the records following the second half-dose of the flu vaccine, I disagree that there was this tremendous difference in her condition in the few weeks following. What the records actually show is that she was relatively the same through November and December, and it was only in January that she started to… So what you're saying is that the Special Master considered the aggravation possibility and made findings that are inconsistent with that? I think that can definitely be drawn from his decision, that even though he didn't conduct a significant aggravation analysis because that was not argued before the court, he did make a finding that the symptoms were not exacerbated by the vaccines, and that would suggest that he did not find that they were aggravated by the vaccines. The other thing that is also required in a significant aggravation test, in an off-table case like this one, is that the petitioner has to provide some theory showing that the vaccine was the cause of the significant aggravation of the condition. So even if there was some showing of an aggravation or an exacerbation of the symptoms, the Special Master also found that Dr. Oleski didn't provide a reliable theory sufficient under Alston to show causation. So even if the court were to find that the Special Master should have conducted a significant aggravation analysis, you've still got this problem of the petitioner's lacking a reliable theory linking the vaccine to the cause of the aggravation of the condition. So we think that the Special Master's decision sufficiently addresses that issue, which, again, we've argued in our brief was waived because the petitioner has never made that argument below. They only raised it after the Special Master's decision had been issued. This whole issue of this case being all about specificity, I just would like to note, has arisen, again, post-decision during the appeal. And it's based on the testimony of Dr. McGeady that J.H. experienced spasticity after the vaccines and that that was somehow different than muscle tone. And now they're making this argument that muscle tone is a muscle disease and spasticity and totally unrelated to any neurological condition. And I would just point out that in Dr. Oleski's report, which is in the appendix at page 361, he notes at the top of that page, I note that both problems with feeding and loss of muscle tone are symptoms of an encephalopathy, an injury to the brain. So, again, their own expert, Dr. Oleski, is saying that loss of muscle tone can be a neurological issue. So their own expert's testimony is not supporting the argument that they're now making on this appeal about spasticity.  It was squarely within the Special Master's discretion to look at the two experts to determine which expert's opinions he felt were more supported by the evidence, were more rational and more logically stated. That's exactly what his job to do, as this Court has noted. This case is undeniably a sad case, but this Court has noted that Congress assigned the Special Master's the unenviable job of sorting through these painful cases and judging the individual merits of the claims. And that's exactly what the Special Master did in this case. He decided that he found the government's expert to be more persuasive, and he found that, as Your Honor has noted, that this wasn't even a close case. And so we would, therefore, unless the Court has further questions, ask the Court to affirm the Special Master's decision below. Thank you, Mr. Johnson. Mr. McHugh has some rebuttal time. Thank you, Your Honor. Clearly, Dr. Oleski did put forth a prong-one theory. It is that the DP, the flu vaccine is known to do neurological damage. It's usually in Bear syndrome, and it's also known to cause chronic inflammatory demyelinating polyneuropathy. And Dr. Oleski noted that the symptoms of CIDP and the symptoms of this child are similar, except she has a far more extreme case. The fact is that you cannot confirm that without doing a dangerous procedure that doctors are not going to do in a case where they don't think they can do any good. So they can do no harm. As Dr. Oleski said, comparing this, the CDIP, he says the vaccine is the same, symptoms are the same, and there's no other reasonable explanation. He also explained that the way this works is molecularly mimicry, and basically the importance of that is in the case of Davis v. The Secretary, which is 211 West Law, 2174535 at page 10, the Court found precisely this theory of causation to be valid and to fulfill prong-one. The Court also says we're a respected expert, and you can't question the fact that both these experts are respected, presents a theory of causation, and the other side just disagrees, then the Court is bound to take the plaintiff's, the Petitioner's expert's word unless the other expert can show why it didn't happen rather than he just disagreed. Here we have a situation where the experts just disagreed across the board. They disagreed as to the significance of the events in the summer. They disagree as to the projection that the vaccine caused this injury despite the fact they both agree that the injury, the spasticity, the severe increase in damage to this child occurred while she was getting these flu shots, and not before and not after, and far from what counsel says, that she looked good in November and December, the children's hospital diagnosis was December 9th. By December 9th, she was fully spastic. This was something that wasn't new. And 23 days before, Dr. Pira didn't see it. So it happened right after the second flu shot. Clearly, challenge, re-challenge. Clearly, consistent with an anamnestic response. And then you go to the Mayo Clinic records that show signs of an autoimmune disaster in the central nervous system. All the evidence is on one side. The expert on the other side just disagrees. And under Davis, that favors the petition. Unless the other side, an expert, can come up with a reason why it isn't, rather than just his opinion, the petitioner should win. So our position here is the special master made a mistake in that he read that the November 17th referral to be for neurology, rather than just PT. So you could say that if indeed she saw a neurological problem on November 16th, maybe that would soften a little bit the petitioner's case. But she didn't see that. She referred for physical therapy only. When the physical therapist reported back to her, the referrals were fast and furious. Obviously, this pediatrician was caught napping on this one. And she was panicking when she got that report from the PT. And then the first neurologist to see this child was in later December. But the kid just continued to decline after that. So this is a case where the evidence of an injury related to the flu vaccine is overwhelming. There was – there is a relationship. The disaster happened immediately. And the theory is well respected. And the evidence is all one-sided. So the fact that the special master ruled against the petitioner is incomprehensible, and that kind of a decision is not entitled to deference, even under the arbitrary and capricious standard. Gentlemen, thank you very much. Thank you, Mr. McHugh.